[Cite as *In re A.F.*, 2021-Ohio-4519.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE A.F., ET AL. | : | |
| Minor Children | : | No. 110503 |
| [Appeal by M.F., Mother] | : | |
| | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 23, 2021

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD17911213 and AD17911214

## *Appearances:*

Flannery | Georgalis, LLC, and W. Benjamin Reese, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Joseph C. Young, Assistant Prosecuting Attorney, *for appellee* Cuyahoga County Department of Children and Family Services.

SEAN C. GALLAGHER, P.J.:

**{¶ 1}** Appellant, M.F. ("Mother"), appeals from the decisions of the Cuyahoga County Court of Common Pleas, Juvenile Division ("juvenile court"), that granted permanent custody of two of her children, A.F. and K.F., to the Cuyahoga

County Division of Children and Family Services ("CCDCFS" or "the agency") and terminated her parental rights. Upon a careful review of the record, we affirm the juvenile court's decisions.

**Background**

{¶ 2} A.F. and K.F. are biological children of Mother. The alleged fathers did not establish paternity and failed to engage in case-plan services. One of the alleged fathers is alleged to be deceased.

{¶ 3} K.F. was born in February 2015, and at seven weeks old, she was placed in a certified foster home that was an approximately three-hour drive away from her mother in Cleveland. A.F. was born in June 2016 and was placed in the same foster home after testing positive for opiates at birth. Although the distance of the placement was not ideal, the record reflects that there was a lack of an appropriate placement in the Cleveland area at the time.[1] It also appears two of Mother's other children previously had been placed in this foster home.[2]

{¶ 4} In November 2016, the juvenile court ordered A.F. and K.F. be placed in the home of S.J., who lives in the Cleveland area and is Mother's close family friend. In May 2017, S.J. received legal custody of the children. However, two

---

[1] We note at least one other recent case in which children had been placed in a foster home two-and-a-half hours away. *In re C.T.*, 8th Dist. Cuyahoga No. 110303, 2021-Ohio-2274, ¶ 24; *see also In re R.G.*, 8th Dist. Cuyahoga No. 108537, 2020-Ohio-3032, ¶ 8 (foster care an hour away was selected based upon availability of an appropriate placement at the time).

[2] Those two children thereafter were placed in the legal custody of their father.

months later, concerns arose causing the children to be removed from S.J.'s home. S.J.'s five biological children also were removed from her home.

{¶ 5} In July 2017, CCDCFS filed a complaint alleging that K.F. was neglected, abused, and dependent and that A.F. was dependent. The complaint requested temporary custody to CCDCFS, and CCDCFS filed a motion for predispositional temporary custody. Following a hearing, the juvenile court granted CCDCFS emergency custody of the children, and the children were placed back in the initial foster home.

{¶ 6} In October 2017, an adjudicatory hearing was held. S.J. stipulated to allegations in an amended complaint, including that K.F. previously was adjudicated as neglected and A.F. previously was adjudicated as dependent; the children had been placed in the legal custody of S.J.; and while in the care of S.J., K.F. was observed to have a black eye for which S.J. had no explanation, K.F. had a severe and contagious skin infection that had not been treated successfully, and another child in S.J.'s home was observed to have bruises for which S.J. had no explanation. The amended complaint also included allegations pertaining to Mother, including among others, that Mother lacks stable and independent housing and is unable to care for the children, Mother suffers from mental health conditions and is not able to meet the needs of the children, and Mother has two other children who have been adjudicated neglected in part due to Mother's lack of stable housing. The juvenile court adjudicated K.F. abused and dependent and adjudicated A.F. dependent. The juvenile court committed the children to the predispositional temporary custody of

the agency. In the adjudication entry for each child, the juvenile court found that the agency had "made reasonable efforts to prevent removal of the child, to eliminate the continued removal of the child from her home, or to make it possible for the child to return home and to make and finalize a permanency plan for the child, mental health, parenting classes, and anger management."

{¶ 7} Mother's case-plan objectives included basic needs, stable housing, and mental health, along with following recommendations and following the conditions of her probation. A case plan was developed for S.J. that included mental health, parenting, basic needs, domestic violence, and anger-management objectives. Amended case plans were approved in the course of the proceedings. The juvenile court entered numerous entries throughout the proceedings that included reasonable-efforts findings.[3] The various findings included, among others, the provision of services for anger management, mental health, basic-needs assistance, parenting, housing, employment, and supportive visitation.

{¶ 8} Following a hearing in May 2018, the children were committed to the temporary custody of CCDCFS. When the juvenile court asked why the children were placed so far away, the social worker's response was because the agency did not have a foster parent in Cleveland at the time. Also, there were no relatives willing or able to provide substitute care. S.J. and Mother were engaged in case-plan services, S.J. had visitation with the children, and the agency was working on

---

[3] Counsel for CCDCFS represents that the juvenile court made a total of 18 reasonable-efforts findings in the course of the underlying proceedings.

visitation with Mother. In the dispositional entry for each child, the juvenile court made a reasonable-efforts determination. The permanency plan for the children was reunification.

{¶ 9} In July 2018, a dispositional-review hearing was held. By the time of this hearing, A.T., who lived closer to Cleveland, had been identified as an interested individual who was willing to care for the children.[4] A.T. had custody of two of her nieces and had recently received emergency temporary custody/predispositional temporary custody of one of Mother's younger children. Although A.T. had expressed a willingness to also have A.F. and K.F. in her home, the agency considered that A.F. and K.F. were originally placed in the foster home and believed that the children should remain in this placement. The social worker indicated that the children were receiving mental-health services and early-childhood services, and they were attending preschool. At the time of the July 2018 hearing, the children had been back in the agency's custody for almost a year. The juvenile court determined that "[p]lacement of the children is appropriate and the continued temporary custody of the children is necessary and is in the children's best interest." The juvenile court found that "[CCDCFS] has made reasonable efforts and continues to make reasonable efforts to make it possible for the children to safely return home through the provision of supportive services" and that "[t]he permanency plan for the children is reunification."

---

[4] A.T. was identified as an interested individual who was related to Mother's sister through marriage.

{¶ 10} On July 30, 2018, a motion for an order to change placement was filed and indicated that A.T. was willing to have A.F. and K.F. placed with her and would be willing to pursue legal custody if necessary. In opposing the motion, the agency asserted that the children were originally placed in the foster home because there were no appropriate relatives available, the children had been with the foster parents for most of their lives and had formed a significant bond with the foster parents, the children had a limited relationship with A.T., the children were being transported for visitation, and the agency believed the children should maintain stability and remain in their placement with the foster parents. The juvenile court held the motion in abeyance.

{¶ 11} On September 25, 2018, a dispositional review hearing was held. Mother was making progress on her case plan, and the court extended her visits with the children to no less than four hours per week, upon approval of a parenting coach. S.J. had completed some case-plan services, and the agency was planning to begin integrating the children with overnight visitation with S.J. However, there had been an altercation between S.J. and her husband when S.J.'s biological children were present, and S.J.'s visitation with her biological children had been suspended due to an open investigation. The former GAL for A.F. and K.F. had filed a motion for an emergency order to restrict overnight visits with S.J. The GAL indicated a concern that there was a significant possibility that S.J.'s husband, who has a criminal record, was spending overnights at S.J.'s home, which posed a serious risk to the children. The juvenile court granted the GAL's motion and ordered overnight visitations with

S.J. be suspended pending further hearing. The juvenile court continued temporary custody of the children and found this to be in the best interest of the children. The juvenile court also made a reasonable-efforts determination and permitted the agency to file an amended case plan. The permanency plan was for reunification.

{¶ 12} In the dispositional-review judgment entry filed November 3, 2018, the juvenile court approved an amended case plan that modified visitation with S.J. The amended case plan noted that S.J. had received a new referral and her case was under investigation. Under the amended case plan, all visits with A.F. and K.F. were suspended pending the outcome of the investigation.

{¶ 13} On January 14, 2019, CCDCFS filed a motion to modify temporary custody to permanent custody. A dispositional-review hearing was held in February 2019. Mother had completed parenting services, but there was concern she had not benefited from the services. Mother had failed to obtain stable housing, had not been consistent with mental-health services, and had not visited with the children in over a month. S.J.'s visitation with her biological children had resumed in November 2018, and she was continuing to work toward reunification. There was an ongoing discussion about whether to reinstate S.J.'s visitation with A.F. and K.F., but visitation was held off while S.J. was doing additional services and showing a benefit for her biological children.

{¶ 14} At a hearing held in April 2019, it was revealed that Mother had a total of seven children at this time. Her other children were in various placements, including one in the care of a paternal relative in another state, two in the legal

custody of their father in Cleveland, and two younger children in the custody of A.T., who was identified as an interested individual. Thereafter, in 2020, Mother gave birth to another child, who also was placed with A.T.

{¶ 15} At a hearing held in May 2019, the social worker indicated that "[t]he Agency has provided supportive services for [M]other in regards to counseling, mental health services, parenting classes, domestic violence classes" and had "followed up with her service providers" and "with her probation officer as well." Mother also was "linked with the Neighborhood Collab." S.J. was making progress on her case plan. S.J. expressed that she would like reunification and stated she was "willing to get all my kids back." The juvenile court expressed concern with S.J. attempting to be a "rescue ranger" because "even as to [her biological] children, at one point in the review process there's a pending motion to modify temporary custody to legal custody to [another individual]." Counsel for S.J. acknowledged that "[S.J.] understands that she is not in a position to have these two children in her care and custody at any time soon. She also has other [biological] children that she's working a case plan to be reunified with." The juvenile court made a reasonable-efforts determination and amended the permanency plan for reunification to "concurrent planning for permanency."

{¶ 16} S.J. continued to engage in and complete case-plan services, and she maintained full-time employment. Although visitation was not occurring with A.F. and K.F., S.J. was working toward reunification with her biological children and there were concerns that adding additional children back into S.J.'s home might

jeopardize her ability to maintain her own biological children in the home. In July 2019, four of S.J.'s five biological children were reunified with her, and biweekly visitation with A.F. and K.F. was reimplemented.

{¶ 17} Preliminary hearings were held on the agency's motion to modify temporary custody to permanent custody in August and October 2019. Prior to the permanent-custody hearing, S.J. filed a motion for legal custody of the children. Mother filed a motion for legal custody to herself or, in the alternative, to former legal custodian S.J. The juvenile court conducted a permanent-custody hearing on February 11, 2021, and April 20, 2021. Testimony and evidence were presented concerning the history of the case, consistent with the record outlined above.

{¶ 18} The testimony of the social worker reflected that Mother participated in case-plan services and made progress on her case plan. She completed parenting classes and domestic violence classes, but concerns remained that she had not benefited from the services. Mother struggled to maintain stable and appropriate housing. At times, Mother was not consistent with visitation and was not communicating with the social worker. From December 2018 to February 2019, Mother had missed eight consecutive visits, even though the children were being transported to Cleveland and waiting at the recreation center where visits were to occur. Mother had given birth to another child and was not really engaged. The agency eventually requested that Mother's visitations be suspended. When visitation resumed in July 2019, Mother came to some visitations, but she "would have other things that [came] up" and the children were having behavioral issues

with being transported to Cleveland. Mother offered to communicate with the children by phone calls or video calls, but she did not do so regularly. Mother had been in county jail since October 2020 on pending charges.

{¶ 19} The social worker testified that S.J. engaged in and eventually completed case-plan services, but the social worker expressed concerns regarding S.J.'s anger management. S.J. initially had weekly visitation with A.F. and K.F. at the agency, and visitation was extended to unsupervised visits from December until March 2018. The social worker testified that in March 2018, S.J. expressed she had to focus on her biological children and asked for visitation with A.F. and K.F. to be biweekly. The social worker testified she observed K.F. had a bruise on her face when she was returned to the foster home after an unsupervised visit with S.J., and S.J. was given a parenting coach. After overnight visitations began with S.J.'s biological children, the agency was planning to implement overnight visitations with A.F. and K.F. However, in September 2018, there was an incident between S.J. and her husband in front of S.J.'s biological children. The juvenile court granted an emergency motion filed by the GAL and ordered overnight visitation to stop. The juvenile court then approved an amended case plan suspending all visitation with A.F. and K.F. pending the outcome of the investigation. As stated by the social worker, "they were focusing on trying to get [S.J.] reunified with her [biological] children." In July 2019, S.J. was reunified with four of her biological children and the agency requested to add S.J.'s visitation with A.F. and K.F. back to the schedule. At that time, biweekly visitation was reimplemented with A.F. and K.F. However,

the children were having behavioral issues with being transported to Cleveland for visitation. K.F. "would kick, scream, yell, hide, unbuckle her seat belt," and this "became a safety issue."

{¶ 20} Although difficulties arose in getting the children to come for visits with Mother and S.J., the agency continued to encourage visitation. The testimony reflects that when the children did not come to visit, S.J. was not taking advantage of opportunities for phone calls or video chats with the children. When the children were coming to visit, S.J. was arriving late and leaving early, and the bond with the children "wasn't really there." The social worker testified that "[S.J.] would be on her phone a lot during the visits. She either would be late for the visit or she would have to leave early from the visits." She also "would cancel the visit after the children [were] here, saying there was something she had to do regarding her own biological children." Even when S.J. was more than 15 minutes late, the social worker would keep the children there to allow S.J. to have time with them. During biweekly virtual visits that were scheduled during the COVID pandemic, the social worker observed that S.J. "was either walking where you would see her either step outside or you would see the top of her vehicle while she was driving." The social worker testified that S.J. visited with the children only about 25 percent of the time.

{¶ 21} When asked about the distance of the children's placement, the social worker responded that during the first custody episode, the initial placement was appropriate, the children were taken care of in the licensed foster home, and transportation was provided. The children were then placed with S.J., who was

granted legal custody. When the children came into custody for the second time, they were returned to the same foster parents they were with the first time. Although A.T. was identified as an interested individual and a motion to change placement was filed, A.F. and K.F. had been placed in the foster home before A.T. had custody of any of Mother's younger children. At the time of the July 2018 hearing, A.T. had other children in her care and had recently received custody of one of Mother's younger children. Also, the social worker testified that A.T. had expressed she wanted to be a support for the girls, but thought it was in their best interest to remain where they were because they were well taken care of and bonded with the foster family.

{¶ 22} Mother is not able to care for the children. K.F. was seven weeks old when she first came into custody, and A.F. was only five days old. Other than the eight months during which the children were placed with S.J., the children were in the care of their foster parents. At the time of the permanent-custody hearing, the children were approximately five and six years old and had been in the temporary custody of CCDCFS for over three years.

{¶ 23} The foster mother testified to the children's negative reactions when it was time to leave with the transportation driver for Cleveland. There also was testimony from the foster mother that during the children's therapy sessions, there was a mock court session with a judge figurine informing the children they would have to go to S.J.'s home, and K.F. began hitting the judge figurine. The foster

mother observed virtual visits with S.J. and indicated "[t]here's really not a whole lot of interaction, especially with K.F."

{¶ 24} The GAL's supplemental report and recommendation includes a lengthy account of the progress made by Mother and S.J. on their case plans, mentions agency concerns that remained, provides observations from home visits at the foster home and at S.J.'s home, and discusses an in-person interview with Mother. The GAL testified that he visited the children at their foster home and found them to be very well bonded with the foster parents "to the point where there appears to be some separation anxiety when even discussion or consideration that they be placed somewhere else comes up." The GAL found that the children's basic needs were well taken care of in the foster home. K.F. was attending kindergarten. The GAL could not "emphasize enough how much anxiety is produced * * *." The GAL testified that he had the opportunity to visit S.J.'s home and he found S.J. was caring for her own children very well and she had appropriate housing. He believed that S.J. had maintained a bond with A.F. and K.F. However, he found because of the circumstances of the case, that the girls had formed a stronger relationship with the foster family. The GAL testified he believed an award of permanent custody to CCDCFS was in the children's best interest.

{¶ 25} On October 28, 2020, the juvenile court entered a detailed decision in each child's case that granted permanent custody to CCDCFS and terminated all parental rights. The juvenile court set forth findings that are consistent with the record, considered and weighed the relevant best-interest factors, and determined

by clear and convincing evidence that a grant of permanent custody to CCDCFS was in the best interest of each child. Mother timely appealed.

**Assignments of Error**

{¶ 26} Mother raises three assignments of error that provide as follows:

I.   The trial court erred by finding that — where the Agency placed K.F. and A.F. more than three hours away and failed to facilitate visitation — the Agency made reasonable efforts to reunify the [children] with their legal guardian, S.J.

II.  Trial counsel did not provide effective assistance of counsel to [Mother] because [counsel] failed to move the juvenile court to award legal custody to an obvious, qualified family member.

III. The trial court erred by finding that reunification with S.J. was not in the best interest of the children where S.J. had successfully completed all her case plan services and been reunited with her biological children.

**Law and Analysis**

{¶ 27} Under her first assignment of error, Mother claims the agency failed to make reasonable efforts to reunite K.F. and A.F. with S.J., who was a legal custodian of the children. We recognize that in the context of a permanent-custody decision, which involves the termination of parental rights, there is little authority on whether such an argument can be made with respect to reunification with a nonparent, legal custodian. Generally, a parent has standing to challenge only how the court's decision denying legal custody to a nonparent impacted the rights of the parent, and the challenge is limited to whether the court's decision to terminate parental rights was proper. *In re A.B.*, 6th Dist. Lucas Nos. L-12-1069 and L-12-1081, 2012-Ohio-4632, ¶ 28-29, citing *In re J.J.*, 9th Dist. Summit No. 21226, 2002-

Ohio-7330, ¶ 36; *see also In re I.H.*, 6th Dist. Lucas Nos. L-20-1062 and L-20-1080, 2020-Ohio-4853, ¶ 44 (finding the plain language of R.C. 2151.414(E)(1) is limited to reviewing the agency's reasonable efforts toward the parents, not the child's paternal great-grandmother). It would seem logical that a challenge to whether an agency made reasonable efforts to reunify a child with a former legal custodian is similarly limited. As this court has recognized, "the issue facing the trial court at the permanent custody hearing [is] not whether the children should have been placed with [the proposed legal custodian]; rather, the issue [is] whether the agency's motion for permanent custody should be granted." *In re C.H.*, 8th Dist. Cuyahoga No. 103171, 2016-Ohio-26, ¶ 26. Nevertheless, even assuming the first assignment of error raises a proper argument, our review reflects the juvenile court's reasonable-efforts findings are supported by the record.

{¶ 28} It is well established that "[p]arents have a 'fundamental liberty interest' in the care, custody, and management of the child." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). "However, government has broad authority to intervene to protect children from abuse and neglect." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28, citing R.C. 2151.01.

{¶ 29} "Overall, Ohio's child-welfare laws are designed to care for and protect children, 'whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety.'" *Id.* at ¶ 29, quoting R.C. 2151.01(A). "When the state

intervenes to protect a child's health or safety, '[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed are called "reasonable efforts."'" *Id.* at ¶ 28, quoting Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation*, 12 B.U.Pub.Int.L.J. 259, 260 (2003). "To that end, various sections of the Revised Code refer to an agency's duty to make reasonable efforts to preserve or reunify the family unit." *Id.* at ¶ 29 (referencing R.C. 2151.412, 2151.413(D)(3)(b), 2151.414(E)(1), and 2151.419). With limited exception, an agency must make reasonable efforts toward family reunification during child-custody proceedings prior to the termination of parental rights. *Id.* at ¶ 43. "If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.* at ¶ 43.

{¶ 30} In these cases, the juvenile court made reasonable-efforts findings at numerous stages of the proceedings, including, but not limited to, when it entered the adjudication and disposition orders. In each of the journal entries granting permanent custody to CCDCFS, the juvenile court made the following reasonable-efforts determinations:

> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parents and legal custodian have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. * * *

* * *

The Court further finds that reasonable efforts were made to prevent the removal of the child from [the] home, or to return the child to the home, and to finalize the permanency plan, to wit: reunification. Relevant services provided to the family and the reasons those services were not successful: notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home the parent and legal custodian have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

* * *

[CCDCFS] has made reasonable efforts to finalize the permanency plan for the child.

{¶ 31} The juvenile court's findings are consistent with the record and supported by the evidence presented at trial. The record reflects that Mother and S.J. were provided with case-plan services and were given supportive-visitation services. Although the children were placed in a foster home approximately three hours away from Cleveland, the record reflects the agency did not have a foster home available in Cleveland at the time of removal and there were no relatives willing or able to provide substitute care. Despite the distance that the children were placed, the agency made extensive efforts to facilitate visitation and to overcome the children's resistance to being transported to Cleveland. After the children were placed in the legal custody of S.J., the children were removed when allegations of abuse arose and they were returned to the same foster home.

{¶ 32} Although A.T. was identified as an interested individual and a motion to change placement was filed on behalf of Mother in 2018, the agency considered that the children originally had been placed in the foster home and the agency believed the children should remain in that placement, where the children's needs were being met. The agency had started visitation with A.T., who expressed a willingness to be a support for the children, and one of Mother's younger children had been placed with A.T.; however, A.F. and K.F. were already well bonded and well taken care of in the foster home.

{¶ 33} Insofar as Mother argues the agency's case plan failed to adhere to the general goals and general priorities set forth in R.C. 2151.412(G) and (H) and the agency's own policies for placements, these are guidelines applied when developing case plans and are not applied in permanent-custody determinations. *In re C.T.*, 8th Dist. Cuyahoga No. 110303, 2021-Ohio-2274, at ¶ 77, citing *In re C.M.*, 4th Dist. Athens Nos. 17CA16 and 17CA17, 2017-Ohio-9037, ¶ 95. Moreover, the failure to comply with these "guidelines" does not necessitate a reversal of a juvenile court's permanent-custody decision. *See generally In re C.M.* at ¶ 95.

{¶ 34} Additionally, Mother's suggestion that the agency withheld visitation and allowed visitation to lapse for a year is not an accurate reflection of the record. The record shows that at times, visitation was hindered because of Mother's inconsistencies or her failure to appear for visitation and because of S.J.'s work toward reunification with her biological children. S.J. initially had weekly visitation, but then she requested a change to biweekly visitation. She was provided a

parenting coach after K.F. returned from an unsupervised visit with an unexplained bruise. After an incident occurred in S.J.'s home causing safety concerns, the juvenile court issued an order to stop overnight visitation from occurring and approved an amended case plan to suspend all visitation pending an open investigation. Once S.J. was reunified with her biological children, the agency resumed visitation with A.F. and K.F. Thereafter, the agency continued to transport the children to visitation, despite S.J.'s failure to arrive on time or to stay for the fully allotted visitation time. When the agency was unable to transport the children to Cleveland, the agency encouraged virtual visitation; however, S.J. failed to fully participate or to meaningfully engage in virtual visitations that were offered.

{¶ 35} The agency demonstrated that it made reasonable efforts toward family reunification. The issue in a reasonable-efforts determination is not whether the agency could have done more, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of the case. *In re D.H.*, 5th Dist. Richland No. 2021 CA 0053, 2021-Ohio-3984, ¶ 58, citing *In the Matter of J.H.*, 5th Dist. Guernsey No. 19CA000025, 2019-Ohio-5184; *see also, In re I.H.*, 6th Dist. Lucas Nos. L-20-1062 and L-20-1080, 2020-Ohio-4853, at ¶ 44. Upon our review of the record, we are unable to find that the juvenile court abused its discretion in making the reasonable-efforts findings in the permanent-custody decisions. The first assignment of error is overruled.

{¶ 36} Under her second assignment of error, Mother claims she received ineffective assistance of counsel because her trial counsel failed to move for A.T. to take legal custody of K.F. and A.F.

{¶ 37} "R.C. 2151.352, as well as constitutional guarantees of due process and equal protection, guarantee parents the right to counsel at all stages of a permanent custody proceeding." *In re M.A.*, 10th Dist. Franklin No. 20AP-345, 2021-Ohio-1078, ¶ 35, citing *In re J.J.*, 10th Dist. Franklin No. 06AP-495, 2006-Ohio-6151, ¶ 28; *see also* Juv.R. 4. "'[T]he right to counsel is the right to the effective assistance of counsel.'" *In re C.S.*, 115 Ohio St.3d 267, 2007-Ohio-4919, 874 N.E.2d 1177, ¶ 93, quoting *McMann v. Richardson*, 397 U.S. 759, 771, fn. 4, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). "'[T]he test for ineffective assistance of counsel used in criminal cases is equally applicable to actions seeking to force the permanent, involuntary termination of parental custody.'" *In re F.M.*, 8th Dist. Cuyahoga No. 110333, 2021-Ohio-2774, ¶ 49, citing *In re Heston*, 129 Ohio App.3d 825, 827, 719 N.E.2d 93 (1st Dist.1998).

{¶ 38} In order to establish a claim of ineffective assistance of counsel, "the defendant must show that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *State v. Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, 174 N.E.3d 754, ¶ 95, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland* at 688. "[A] court must

indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *." *Id.* at 689. To establish prejudice, the defendant must demonstrate there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

{¶ 39} Mother fails to show that trial counsel's representation fell below an objective standard of reasonableness. Mother claims that her trial counsel should have argued and laid the groundwork for A.T. to take legal custody of the children. Mother references two semiannual review reports that state A.T. "expressed an interest in [A.F. and K.F.]" and "[A.T.] remains a support, and is committed to caring for [the children]." Mother acknowledges her trial counsel filed a motion for an order to change placement arguing that the children should be placed with A.T., who at the time had received emergency custody of one of Mother's younger children. The motion was held in abeyance by the juvenile court. The record reflects that the children were initially placed in the foster home, they were returned to that foster home after they were removed from S.J.'s legal custody, they were well bonded with the foster family, and their needs were being met in the foster home. There was a lack of any significant bond between the children and A.T. At the time of the permanent-custody hearing, Mother's trial counsel advocated for legal custody to S.J., who had been successfully reunified with her biological children and was the former legal custodian to the children.

{¶ 40} Mother maintains that A.T. actively supported Mother's efforts toward reunification and had been a successful caregiver for three of Mother's younger children. She claims that trial counsel should have continued to pursue A.T. as an alternative placement. However, the challenged action reflects sound trial strategy within the range of reasonable professional assistance. Considering all the circumstances, Mother fails to establish counsel's performance was deficient. Additionally, Mother fails to show a reasonable probability that the outcome of the permanent-custody proceeding would have been different had trial counsel pursued legal custody to A.T.

{¶ 41} This case is distinguishable from *In re AR.S.*, 2021-Ohio-1958, 174 N.E.3d 28, ¶ 51 (8th Dist.), cited by Mother, where this court, in a split decision, reversed an award of permanent custody when the children, who were older, expressed a desire to live with their aunt who had been a part of their lives since they were born. *Id.* at ¶ 51-65. In this case, the children had lived in the foster home for all but eight months of their young lives, they were well bonded to the foster family, and they expressed great anxiety with the prospect of being placed elsewhere. This case is more akin to *In re T.H.*, 8th Dist. Cuyahoga No. 107947, 2019-Ohio-3045, where we affirmed an award of permanent custody and the denial of legal custody to a relative when, despite a relative's willingness to assume legal custody, the only home the children had really known was that of the foster home and upon weighing all the factors in R.C. 2151.414(D), the juvenile court determined that an award of permanent custody to the agency was in the child's best interest. *Id.* at ¶ 18-25; *see*

*also In re C.T.*, 8th Dist. Cuyahoga No. 110303, 2021-Ohio-2274, at ¶ 80-82 (reaching a similar result). Indeed, the willingness of a relative or interested individual to care for a child does not alter what a court must consider in determining whether an award of permanent custody is in the child's best interest. *See In re T.H.* at ¶ 19, citing *In re A.D.*, 8th Dist. Cuyahoga No. 85648, 2005-Ohio-5441, ¶ 12; *see also In re C.T.* at ¶ 81. Further, where there is no reasonable probability a motion for legal custody would have been granted, then the failure to file it does not warrant a finding of ineffective assistance of counsel. *In re S.D.*, 11th Dist. Ashtabula No. 2014-A-0063, 2015-Ohio-354, ¶ 53; *In re G.W.*, 12th Dist. Butler No. CA2013-12-246, 2014-Ohio-2579, ¶ 25.

{¶ 42} After reviewing the record in this case, we find Mother has not established that she received ineffective assistance of counsel. The second assignment of error is overruled.

{¶ 43} Under her third assignment of error, Mother challenges the juvenile court's decision to award permanent custody to CCDCFS by maintaining that the juvenile court focused "nearly exclusively on the lack of a bond" with the children rather than S.J.'s efforts to regain custody. This simply was not the case.

{¶ 44} Because of the fundamental interests involved, the authority to terminate parental rights is carefully circumscribed by statute in Ohio. *See In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 41-42. Ultimately, the natural rights of a parent are always subject to the ultimate welfare of the child, which is the controlling principle to be observed. *In re B.C.*, 141 Ohio St.3d 55, 2014-

Ohio-4558, 21 N.E.3d 308, ¶ 20, citing *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 45} Once an agency has filed a motion requesting permanent custody of a child pursuant to R.C. 2151.413(A), "'R.C. 2151.414 sets forth the procedures a juvenile court must follow and the findings it must make before granting a motion filed pursuant to R.C. 2151.413.'" *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, at ¶ 22, quoting *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 9. This court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence. *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 48, citing *In re M.J.*, 8th Dist. Cuyahoga No. 100071, 2013-Ohio-5440, ¶ 24.

{¶ 46} Pursuant to R.C. 2151.414(B), permanent custody of a child may be awarded to a children services agency if the court finds, by clear and convincing evidence, that (1) it is in the best interest of the child to grant permanent custody of the child to the agency, and (2) any of the grounds listed in R.C. 2151.414(B)(1)(a)-(e) apply. Mother does not contest that the second prong was established. Mother's sole challenge relates to the juvenile court's best-interest determination.

{¶ 47} In conducting a best-interest analysis under R.C. 2151.414(D)(1), "[t]he court must consider all of the elements in R.C. 2151.414(D) as well as other relevant factors. There is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513,

857 N.E.2d 532, ¶ 56. "The statute does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor. The statute does not even require the court to weigh that factor more heavily than other factors." *Id.* at ¶ 64. "[R.C. 2151.414(D)(1)] requires a weighing of all the relevant factors * * * [and] requires the court to find the best option for the child * * *." *Id.* Also, a juvenile court is not required to make specific findings regarding each best-interest factor listed in R.C. 2151.414(D)(1) or to include in its decision a written discussion of each of those factors, although juvenile courts are "strongly encouraged to do so." *In re A.M.*, Slip Opinion No. 2020-Ohio-5102.

{¶ 48} Here, in determining whether a grant of permanent custody to CCDCFS was in the best interest of each child, the juvenile court considered the statutory factors under R.C. 2151.414(D)(1)(a) through (e). In each case, the juvenile court stated as follows:

> Upon considering the interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster parents; the wishes of the child; the custodial history of the child * * *; the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody; and, the report of the Guardian ad Litem, the Court finds by clear and convincing evidence that a grant of permanent custody is in the best interests of the child and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent or legal custodian. * * *

{¶ 49} Additionally, in each case, the juvenile court considered other relevant factors, including the following:

> Other relevant factors: The Court finds the report of the GAL and his recommendation to have well documented the case and reporting to

draw upon his conclusions.  Mother has spent little time caring for the child; that the child had only been in the custody of the legal custodian for a period of eight months prior to her removal from her home and second commitment to the temporary custody of CCDCFS; that mother and legal custodian had demonstrated progress with case plan objectives which allowed the legal custodian's biological children to be returned to her home, both mother and the legal custodian struggled to maintain a bond with the child to allow the child to be reunified with either the parent or legal custodian.  * * * Mother, after obtaining housing and employment and support of a parenting coach, is now incarcerated.  Nor does it appear from the evidence that the child had been sufficiently integrated into the home of the legal custodian to support that reunification with her would serve the best interest of the child.

The juvenile court also found in A.F.'s case that "[t]he child expresses no desire to return to either [Mother's or S.J.'s] home[,]" and in K.F.'s case that "[t]he child is adamantly opposed, including expressions of aggression and tantruming, when faced with visiting or returning [to] either home."

{¶ 50} The juvenile court's findings are consistent with the record.  Mother was incarcerated at the time of the motion for permanent custody and acknowledges she "cannot take custody of her children herself."  Evidence was presented that the children's siblings were in various placements.  The juvenile court was aware that S.J. had demonstrated sufficient progress with her case-plan objectives and was reunified with her biological children.  However, the juvenile court could not ignore that A.F.'s and K.F.'s cases had been pending for a long time and they have spent the vast majority of their young lives in the foster home.  The GAL could not "emphasize enough" the anxiety that is produced with the prospect of the children being placed somewhere else.  Mother herself acknowledges that "[b]y all accounts, the foster

home where K.F. and A.F. were placed is a loving one * * * [a]nd the girls are now attached to their foster parents such that changing their placement would be difficult." Ample other testimony and evidence was presented to support the juvenile court's findings.

{¶ 51} The record does not support Mother's claim that the juvenile court failed to give due consideration to S.J.'s efforts to regain custody. It is apparent from the record that the juvenile court considered and weighed all relevant factors in determining by clear and convincing evidence that an award of permanent custody to CCDCFS was in each child's best interest. We certainly commend S.J. for her commitment to A.F. and K.F. and her efforts to support family reunification. However, in deciding whether to award permanent custody, the best interest of the child remains the paramount consideration. *In re N.N.*, 8th Dist. Cuyahoga No. 110443, 2021-Ohio-3931, ¶ 16, citing *In re M.J.M.*, 8th Dist. Cuyahoga No. 94130, 2010-Ohio-1674, ¶ 15; *In re E.M.B.T.*, 8th Dist. Cuyahoga No. 109479, 2020-Ohio-4308, ¶ 32, citing *In re J.S.*, 8th Dist. Cuyahoga No. 108406, 2019-Ohio-4467, ¶ 14. As expressed by the GAL, "[the children] require a more stable long-term environment than Mother and [S.J.] can provide for the foreseeable future."

{¶ 52} We also cannot overlook that "[u]nlike permanent custody that divests the natural parents of all parental rights, legal custody vests in the custodian the physical care and control of the child while the natural parents retain residual parental rights, privileges, and responsibilities." *In re E.M.B.T.* at ¶ 24, citing R.C.

2151.011(B)(31), 2151.011(B)(21), and 2151.353(A)(3)(c).[5] "'[I]f permanent custody to the agency is in [a child's] best interest, legal custody [to an interested individual] necessarily is not.'" *In re C.T.*, 8th Dist. Cuyahoga No. 110303, 2021-Ohio-2274, at ¶ 82, quoting *In re V.C.*, 8th Dist. Cuyahoga Nos. 102903, 103061, and 103367, 2015-Ohio-4991, ¶ 61. "Where parental rights are terminated, the goal is to create 'a more stable life for the dependent children' and to 'facilitate adoption to foster permanency for children.'" *In re C.T.* at ¶ 61, citing *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, at ¶ 67.

{¶ 53} Upon careful review, we find the award of permanent custody to CCDCFS is supported by clear and convincing evidence in the record and is not against the manifest weight of the evidence. The third assignment of error is overruled.[6]

{¶ 54} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

---

[5] We note that Mother cites *In re D.F.*, 2019-Ohio-3046, 140 N.E.3d 1081, ¶ 55 (8th Dist.), which is distinguishable from this case. *In re D.F.* was a split decision in which a decision to grant permanent custody was reversed upon finding "the remedy of last resort" of terminating a mother's parental rights was not supported by clear and convincing evidence when, among other factors, the mother had completed case-plan services and had a strong bond with the children, and it was not a case in which the children were at any point out of contact with their mother. *Id.* at ¶ 38-56.

[6] We have thoroughly reviewed the record in this case and considered all the arguments raised. We are not persuaded by any of appellant's arguments that are not specifically addressed herein.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
SEAN C. GALLAGHER, PRESIDING JUDGE

MARY EILEEN KILBANE, J., and
EMANUELLA D. GROVES, J., CONCUR