[Cite as *In re R.H.*, 2024-Ohio-5009.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE R.H.                                    :
                                              :
A Minor Child                                 :          No. 113939
                                              :
[Appeal by T.H., Mother]                      :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 17, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-23-907330

---

### *Appearances:*

Marc L. Stolarsky, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Michelle A. Myers, Assistant Prosecuting Attorney, *for appellee.*

EILEEN A. GALLAGHER, P.J.:

**{¶ 1}** Appellant-mother, T.H. ("Mother"), appeals from the decision of the Juvenile Division of the Cuyahoga County Court of Common Pleas (the "juvenile court") that granted permanent custody of her minor daughter, R.H., to appellee, the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"). For the reasons that follow, we affirm.

## I. Factual Background and Procedural History

{¶ 2} On June 26, 2023, CCDCFS filed a complaint for dependency and temporary custody of R.H. (d.o.b. June 8, 2022), along with a motion for predispositional temporary custody. R.H. had been in the uninterrupted temporary custody of CCDCFS since November 30, 2022 based on the filing of two prior complaints. The two prior complaints (Cuyahoga C.P. Juv. Nos. AD22911338 and AD23903938) were not resolved within statutory time limits and were dismissed.

{¶ 3} The complaint alleged that Mother had a substance abuse disorder and mental health issues that impacted her ability to provide a stable home for her child, that Mother had not yet completed treatment for her substance abuse disorder, that Mother had engaged in mental health services but continued to have difficulty regulating her emotions and that Mother did not have stable and appropriate housing. With respect to the child's alleged father, Ras.H., the complaint alleged that he lacked stable and appropriate housing, had failed to establish paternity and had failed to consistently support or visit with R.H. since birth. The complaint further alleged that reasonable efforts were made by the agency to prevent removal of the child from the home and that removal of the child was in her best interest.

{¶ 4} On June 27, 2023, the juvenile court held an evidentiary hearing on the agency's motion for predispositional temporary custody. At the conclusion of the hearing, the juvenile court granted the agency's motion for predispositional temporary custody and committed R.H. to the emergency temporary care and

custody of CCDCFS. In its June 28, 2023 journal entry, the juvenile court found that the agency had made reasonable efforts under R.C. 2151.419 to prevent removal of the child from the home, to eliminate the continued removal of the child from the home or to make it possible for the child to return home, noting that the agency had provided mental health services, parenting services, housing services and substance abuse services to Mother. With respect to why those services had not been successful, the juvenile court stated, "Mother has unsuccessfully engaged in mental health and drug treatment services. Mother was unsuccessfully discharged from Family Recovery Court." The juvenile court further found that CCDCFS had made "intensive efforts to locate relatives for placement purposes," including "[i]nvestigating relatives identified," but that "there is not a suitable relative of the child who is willing to be a temporary custodian of the child."

{¶ 5} On July 17, 2023, the agency filed a case plan that required Mother to complete a substance abuse assessment, comply with any treatment recommendations, submit to random drug screens and live a sober lifestyle; complete a mental health assessment and comply with recommendations for mental health services and medication to manage her mental health issues; address parenting issues and obtain and maintain safe, stable housing and demonstrate an ability to meet her child's basic needs. The permanency goal was reunification. The juvenile court approved the case plan.

{¶ 6} On September 11, 2023, the juvenile court conducted adjudicatory and dispositional hearings. Mother stipulated to the allegations of the complaint

that related to her, stipulated that R.H. was dependent and agreed that R.H. be placed in the temporary custody of the agency. Cherron Phillips, a CCDCFS social worker, testified that, since June 2022, the agency had referred Mother for substance abuse services, mental health counseling, parenting classes and referrals to assist with housing and that the agency was continuing to work with Mother to help her engage in those services. Phillips testified that, at the time of the hearing, Mother was not in a treatment program and had not begun her most recent attempt at engaging in services because she was waiting on an insurance card. Phillips stated that R.H. was currently in a foster placement and that Mother had regular, weekly visits with R.H. in which Mother was "very appropriate, very caring, very loving to her daughter." Phillips indicated that the agency had previously investigated maternal aunts for placement but they were not approved and that the agency was currently investigating a maternal great-aunt for placement. She stated that Mother had not identified any other family members for possible placement. Phillips testified that the alleged father, Ras.H., had not established paternity, was not engaged in services, did not have safe and stable housing and had not visited with R.H. R.H. was adjudicated dependent and placed in the temporary custody of CCDCFS.

{¶ 7} In its September 27, 2023 journal entry setting forth the adjudication and disposition of R.H., the juvenile court again found that CCDCFS had made reasonable efforts to prevent the removal of R.H. from the home, to eliminate the

continued removal of R.H. from the home or to make it possible for R.H. to return home, as follows:

> These efforts are: parenting education classes, substance abuse assessment and treatment as recommended, mental health services, assistance in finding adequate housing and paternity establishment.

The juvenile court further found that the agency had made "intensive efforts to locate relatives for placement purposes" and that these efforts consisted of "[i]nvestigating relatives identified" but that "[s]uitable relatives cannot be located."

{¶ 8} On October 2, 2023, the agency filed a motion to modify temporary custody to permanent custody to CCDCFS pursuant to R.C. 2151.413 and Juv.R. 19 ("motion for permanent custody"). In support of the motion, the agency submitted an affidavit from Phillips, who averred that R.H. had been committed to the emergency custody of CCDCFS on November 30, 2022 and had remained in the uninterrupted custody of the agency since that time. As related to Mother, Phillips further averred that (1) Mother had been diagnosed with a substance use disorder and recommended for residential treatment but had not completed a drug treatment program and continued to use illegal substances; (2) Mother had been diagnosed with multiple mental health disorders and recommended for counseling and medication but had not been consistent with her mental health services and continued to display "erratic behavior," (3) Mother had failed to complete a parenting education program and (4) Mother lacked stable and appropriate housing.

**{¶ 9}** A dispositional review hearing was held on November 7, 2023. After considering the evidence presented by the parties and the recommendation of the guardian ad litem, the juvenile court ordered the continuation of temporary custody. Once again, the juvenile court found that the agency had made reasonable efforts "to make it possible for the child to safely return home through the provision of supportive services" and "to finalize the permanency plan for the child" and that these efforts consisted of "substance abuse assessment and treatment as recommended, mental health services, assistance in finding adequate housing and paternity establishment." The juvenile court found that "[t]here has not been significant progress on the case plan by the mother and progress has not been made in alleviating the cause for the removal of the child from the home." The juvenile court further found that "continued wardship of the child is necessary and is in the child's best interest." The juvenile court stated that the child could not be placed with relatives because "[n]o relatives are willing and able to provide substitute care. Suitable relatives cannot be located."

### A. Hearing on Motion for Permanent Custody

#### 1. Mother's Request for Continuance

**{¶ 10}** On March 14, 2024, the juvenile court held a hearing on the agency's motion for permanent custody. At the outset of the hearing, Mother made an oral motion, requesting a continuance to give the agency more time to investigate "other names" she had given the agency as a potential caregiver placement for, or as a legal custodian of, R.H. The juvenile court indicated that Mother could "make arguments

on it" during the hearing but denied the request for a continuance, noting that "this matter has been pending since November 30, 2022" and reasoning that (1) Mother's arguments are "arguments for trial and not a basis for a continuance" and (2) Mother's motion did not comply with Juv.R. 23 or Loc.R. 35(C) of the Cuyahoga County Court of Common Pleas, Juvenile Division ("Juv.Loc.R. 35(C)").

### 2. Evidence Presented at the Permanent Custody Hearing

{¶ 11} Amanda Whitman, a family advocate in CCDCFS' sobriety treatment and reducing trauma ("START") unit, CCDCFS child protection specialist Mark Pountney and Mother testified at the permanent custody hearing. No exhibits were admitted into evidence. A summary of the relevant testimony follows. At the time of the hearing, R.H. was approximately 21 months old.

### a. The Agency's Witnesses

{¶ 12} Whitman and Pountney testified that they were assigned to the case in September 2023 and that, at that time, they reviewed the case file and spoke with Mother and the previously assigned CCDCFS social workers and advocates to learn the case history.

{¶ 13} Whitman testified that R.H. came into agency custody on November 30, 2022 and had remained in agency custody since that time. She stated that the agency initially became involved with the family because Mother tested positive for marijuana when R.H. was born in June 2022 and that there were also concerns regarding Mother's mental health and housing. She indicated that services

were provided to Mother at that time, including substance abuse and mental health services, to try and prevent the removal of R.H. from Mother's care.

{¶ 14} Whitman testified that the agency developed a case plan for Mother to address concerns regarding Mother's substance abuse, mental health, housing and parenting issues. She stated that Mother had diagnoses of PTSD, anxiety, depression and adjustment disorder and explained that, when a parent has both substance abuse and mental health issues, the agency attempts to refer the parent to a service provider that can address both concerns so that the parent is "not overloaded with working with different providers and . . . there's a steady communication with the providers so [the agency] can help the parents to the best of our ability."

{¶ 15} Whitman testified that, based on her review of the case file and her discussions with other CCDCFS workers, the agency had referred Mother to approximately ten different substance abuse or combined substance abuse/mental health programs since June 2022. Whitman briefly described each of the programs to which Mother had been referred and the results of those referrals. She indicated that Mother was first referred to Signature Health's dual-diagnosis program for substance abuse and mental health services, that Mother completed the assessment and engaged in services "briefly" and "sporadically," but that she did not follow through with recommended services for individual counseling, medication management, psychotherapy and case management.

{¶ 16} Whitman stated that Mother was referred to New Visions three times: in June, September and November 2022 for substance abuse and mental health services. With respect to the first two referrals, Mother did not complete an assessment. With respect to the third referral, Mother completed an assessment and received a recommendation that she complete intensive outpatient therapy. Mother started the program but was "unsuccessfully discharged and recommended for a higher level of care."

{¶ 17} Whitman indicated that in mid-October 2022, Mother was referred to the Hitchcock Center for Women (the "Hitchcock Center"). Mother remained in residential care at the Hitchcock Center for approximately one week but was discharged because she did not attend group therapy on time, was "aggressive" with staff, her behavior and emotions were erratic and she was alleged to have left R.H. unattended, to have yelled and cussed at R.H. and to have failed to meet R.H.'s needs. In early 2023, Mother was again referred to New Visions for intensive outpatient treatment where she started treatment but was discharged before completion.

{¶ 18} Whitman testified that Mother was next referred to People, Places & Dreams but that they would not accept her due to the severity of her mental health issues. Mother was then referred to Laurelwood. Agency staff attempted to transport Mother to Laurelwood for an assessment but Mother "opted not to go."

{¶ 19} In February 2023, Mother was court-ordered to go into residential treatment and completed 30 days of residential inpatient treatment at Ethans

Crossing. After Mother completed her inpatient treatment, she was recommended for sober living and intensive outpatient services. Mother went to Mommy and Me, a sober living facility, but was asked to leave after three days because she broke the rules of the program by bringing a male into the facility. In April 2023, Mother was referred for dual-diagnosis services at Transcend. She initially engaged in services but was discharged from the program on May 25, 2023 for noncompliance, i.e., "she wasn't attending her sessions, she wasn't dropping for their agency and she wasn't working with her counselor."

{¶ 20} In June 2023, Mother was once again referred to Signature Health for medication management, individual therapy and case management in an attempt to stabilize her mental health. Whitman indicated that Mother was prescribed medication and took it "briefly," but eventually stopped attending the sessions and stopped taking her medication. Whitman stated that in September 2023, Mother signed herself up for services at Firelands Behavioral Health in Sandusky but that services were never initiated because Mother failed to provide requested insurance information.

{¶ 21} Whitman testified that after she was assigned to the case in September 2023, Mother informed her that she wanted to stop using marijuana but said it was "really hard." Whitman stated that she suggested to Mother that it might benefit her to be "removed from [her] environment to try and get [herself] together" and offered to get Mother into another inpatient treatment program. She indicated that Mother "initially said she was willing," but that Mother did not follow through.

{¶ 22} With regard to Mother's mental health, Whitman testified that in January 2024, she had a "heart-to-heart" with Mother regarding Mother's need to re-engage in mental health services and that she was present when Mother scheduled appointments at Signature Health but that Mother did not keep those appointments. Whitman stated that, to her knowledge, Mother was not engaged in mental health services at the time of the hearing. Although Whitman agreed that it appeared that Mother "really did want to get clean and sober, but was unable to," Whitman stated that there was nothing further the agency could do to help Mother address her mental health and substance abuse issues.

{¶ 23} Whitman testified that the agency had also required that Mother submit to drug screens to determine her sobriety. Whitman stated that, initially, Mother was "pretty consistent with dropping." During that time, Mother had 16 positive screens for marijuana and 2 negative screens. After April 2023, however, Mother stopped complying with requested drug screens. Whitman stated that Mother attempted a drug screen in October 2023 but that there was a verbal altercation between Mother and a staff member at the testing facility, and Mother was asked to leave.

{¶ 24} Whitman testified that Mother had weekly, supervised visits with R.H., that Mother was "very attentive" to R.H. during visits and that she "[d]efinitely" loves her child but that Mother's untreated mental health issues were a concern because they led to "erratic" behavior. Whitman explained that Mother's "emotions go from very high to low, crying, angry" and that she "doesn't appear to

be mentally stable." She indicated that although it did not appear to be Mother's intention to startle or scare her child, but unfortunately, "those things happen[ed] because of the behavior," and that, at times, R.H. "visibly react[ed]" to Mother's behavior during visits by shaking, becoming "very standoffish" or seeking comfort from the CCDCFS caseworker.

{¶ 25} Pountney offered similar testimony. Pountney testified that Whitman's description of the agency's referrals for substance abuse and mental health services was consistent with "what [he] knew to be the history of the case." He stated that, to his knowledge, Mother had never had a significant period of sobriety since the agency had been involved in the case and that he had not seen any improvements in Mother's mental health. Pountney indicated that when Mother was at the Hitchcock Center, it was reported that she had "a number of conflicts with staff, being argumentative," that she had slammed the door in her counselor's face and that she had yelled at R.H. for crying. He stated that when he interacted with Mother, he "still [saw] her escalate and become, you know, quite angry, irritated during visits to the point to where, you know, it was scaring her daughter."

{¶ 26} Pountney testified that Mother likewise had not met the housing objective of her case plan. He indicated that, at the time of the hearing, Mother was living with friends in Cleveland, that Mother's current living situation was not a safe and stable home for R.H. and, to his knowledge, Mother had not had stable housing since the agency had become involved in the case. Pountney stated that he had not

yet viewed Mother's current living situation because Mother had told him she "planned on only being there temporarily" and "wanted to find her own housing."

**{¶ 27}** Pountney testified that the agency had twice made referrals to Community Collab to assist Mother with securing housing but that she did not follow through and that Whitman had also attempted to assist Mother in obtaining housing through CMHA but that Mother had missed an appointment and had to restart the process. He stated that program case managers would have also assisted Mother with obtaining housing if she had completed the programs to which she had been referred at the Hitchcock Center, Mommy and Me or Signature Health.

**{¶ 28}** With respect to the parenting education component of Mother's case plan, Pountney testified that Mother had been referred to parenting programs at New Visions and Beech Brook but that she did not complete them. He stated that he had not personally referred Mother for a parenting education program because he felt it was more important for Mother to address her mental health and addiction issues before he made additional referrals for parenting classes.

**{¶ 29}** Pountney testified that Mother had weekly, supervised visits with R.H., that she was consistent with her visitation, that she was loving, attentive to, and acted appropriately with, R.H. during visitation and that Mother was receptive to his suggestions to modify her conduct during visits. Pountney indicated that Mother also attended "video visits" with R.H. that she coordinated with the foster mother and he stated that it would not surprise him if R.H. became excited when she saw Mother during these video visits.

{¶ 30} Pountney testified that, although he never saw "any kind of negativity" by Mother toward R.H. during visits, he was, nevertheless, concerned about Mother being left alone with R.H. because when Mother raised her voice during visits (e.g., during phone calls with family members), it negatively impacted R.H., causing her to become scared. He explained, "I would have concerns if the visits weren't supervised to what degree she would get escalated [given] the times I had to remind her to calm down." He stated that he did not know whether the escalation was attributable to "being high" or Mother's mental health issues and that, in his view, "the two could [not] really be distinguished."

{¶ 31} Pountney testified that R.H. was in foster care, that she was "doing very well there" and that she had no special needs. He stated that the agency had investigated a great-aunt for placement, that an assessment was completed on her and that she was found to meet Ohio Administrative Code standards for consideration but that the great-aunt was not approved for placement due to the agency's concern about permanency, i.e., the great-aunt was 83, she lived alone and it was uncertain whether she would be able to care for R.H. long term. He stated that Mother had also given him a name of a nonrelative friend she wanted the agency to consider for placement but that the agency's investigation of that person had not yet been completed because agency staff were, at that time, already working on the investigation of the great-aunt and said they "couldn't do two at the same time."

{¶ 32} Pountney stated that, in his view, Mother was not in a position to provide a safe home for R.H. because the home in which she was then staying was

not permanent, her mental health was not stable and she was not sober. Given the history of the case and the efforts that had been previously made to assist Mother in achieving sobriety and stabilizing her mental health, Pountney did not believe it was likely that Mother would be able to provide a safe, stable home for R.H. at any time in the foreseeable future. Both Whitman and Pountney confirmed that Ras.H. had never established paternity of R.H.

### b. Mother's Testimony

{¶ 33} Mother testified regarding her living arrangements since R.H.'s birth and her attempts at complying with her case plan. She stated that despite her requests, the agency had not helped her find housing and had not "check[ed] out" her current living situation where she lives with a friend and the friend's two children. She stated that she left or was "put out" of the Hitchcock Center after one-and-one-half weeks because she was "always late" to class due to difficulties in getting R.H. ready and because she had responded to a text about her daughter when she was not permitted to use her cellphone. Mother stated that she lost custody of R.H. because she "kept testing dirty for marijuana."

{¶ 34} Mother acknowledged that she had attended, but did not complete, services at New Visions, that her CCDCFS case workers continued to refer her, unsuccessfully, to other programs for treatment and that she was forced to leave Mommy and Me because she broke the rules. Mother indicated that she had obtained medication, for a time, from Signature Health and Ethan's Crossing but that she eventually stopped taking it.

**{¶ 35}** When asked why she did not comply with the agency's referrals for services, Mother replied, "There was a lot going on, like this all hit me at once. It just swallows me." She indicated that her mother had been hospitalized with bone cancer, that she was having issues with her medication, that she "couldn't function right" after R.H. was taken from her and that she used marijuana to help her cope. Mother acknowledged that Whitman had offered to refer her to another residential treatment program after she was assigned to the case but stated that she refused because "it was just something I didn't want to do . . . . It's just something about me like feeling like too confined."

**{¶ 36}** Mother testified that although she initially complied with the agency's requests for drug screens, she eventually stopped because she was still using marijuana and knew the results would be positive and informed her CCDCFS advocate or caseworker of this fact: "So I feel where I really missed appointments, so I just didn't drop even though I know — I was telling you out of my own mouth I'm like dirty."

**{¶ 37}** Mother admitted that she was not taking medication or receiving any mental health services at the time of the hearing. She stated that Signature Health told her she "had to wait" after she had missed two appointments when her mother was in intensive care. Mother acknowledged that she was still using marijuana at the time of the hearing, albeit on a "very limited" basis, to cope with her mental health issues.

**{¶ 38}** Mother testified that she always attended her visits with R.H., that she bought R.H. toys, food and clothes and that she had a positive relationship with R.H.'s foster mother, who often facilitated video visits between Mother and R.H. Mother indicated that R.H. was happy and excited to see Mother and that they were bonded to one other. Mother asserted that she was "a good mom," that she could provide for her daughter and that she felt "like that's being taken away from me because of my mental health."

**{¶ 39}** Mother stated that her great-aunt could drive, move and shop on her own, that there were no other relatives with whom R.H. could be placed and that the "only other person" she knew with whom R.H. might be placed was an individual, D.N., with whom she had "been friends ever since we were young." She stated that she had provided D.N.'s information to the agency for consideration but that she had been told she had to wait until the agency completed the investigation of her great-aunt before D.N. could be investigated as a possible placement for R.H.

### c.   The Guardian Ad Litem's Recommendation

**{¶ 40}** On March 8, 2024, R.H.'s guardian ad litem submitted a written report in which she recommended that permanent custody be granted to the agency.

**{¶ 41}** In her report, the guardian ad litem stated that R.H. is in need of a safe and secure permanent home, that Mother requires ongoing treatment services to ensure her sobriety and mental health, that Mother has had difficulty maintaining consistent substance abuse and mental health treatment because she does not stay connected to any identified treatment provider for various reasons and that Mother

has been referred to numerous mental health and substance abuse providers by CCDCFS but has failed to complete required programming.

{¶ 42} At the hearing, the guardian ad litem confirmed that nothing she had heard at the hearing or otherwise since filing her report caused her to change her recommendation.

### 3. The Juvenile Court's Decision

{¶ 43} On April 22, 2024, the juvenile court issued a written journal entry granting permanent custody of R.H. to the agency and terminating Mother's parental rights. The juvenile court found, by clear and convincing evidence, that R.H. could not be placed with either of her parents within a reasonable time or should not be placed with her parents and that it was in R.H.'s best interest to be placed in the permanent custody of the agency. The juvenile court further found that the agency had made reasonable efforts to prevent removal of R.H. from the home and to finalize the permanency plan for R.H. and that the agency had made intensive efforts to locate relatives for placement purposes, including "investigating the Great Grandmother [sic] who was not approved due to her age being 84 years old," and noting that "[n]o other relatives' names" had been "given to be investigated."

{¶ 44} Mother appealed, raising the following two assignments of error for review:

> First Assignment of Error: The trial court erred by denying the mother's continuance request violating her fundamental right to due process in accordance with the Fourteenth Amendment Due Process

Clause and Ohio Const. Art. 1, § 16, establishing a high standard of fundamental fairness to be considered in dealings of custody of a mother to her child.

Second Assignment of Error: The court erred in determining that the prosecution met their burden of proof of clear and convincing evidence under Ohio Rev. Code Ann. § 2151.419(A), where reasonable efforts of reunification are to be a determination of the parents['] situation at the time of the hearing and at the time of the hearing months had passed since she was evaluated.

## II.    Law and Analysis

**{¶ 45}** We take our responsibility in reviewing cases involving the termination of parental rights and the award of permanent custody very seriously. The right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 2015-Ohio-314, ¶ 67 (8th Dist.), quoting *In re Hayes*, 79 Ohio St.3d 46, 48 (1997); *see also In re Murray*, 52 Ohio St.3d 155, 157 (1990) (a parent has a "'fundamental liberty interest' in the care, custody, and management" of his or her child), quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).

**{¶ 46}** Because termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" *In re J.B.*, 2013-Ohio-1704, ¶ 66 (8th Dist.), quoting *In re Hoffman*, 2002-Ohio-5368, ¶ 14, it is "an alternative of last resort," *In re Gill*, 2002-Ohio-3242, ¶ 21 (8th Dist.). It is, however, "sanctioned when necessary for the welfare of a child." *In re M.S.*, 2015-Ohio-1028, ¶ 7 (8th Dist.), citing *In re Wise*, 96 Ohio App.3d 619, 624. "'All children have the right, if possible,

to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102 (8th Dist. 1996). Where parental rights are terminated, the goal is to create "a more stable life for the dependent children" and to "facilitate adoption to foster permanency for children." *In re N.B.* at ¶ 67, citing *In re Howard*, 1986 Ohio App. LEXIS 7860, *5 (5th Dist. Aug. 1, 1986)

## A. Denial of Motion for Continuance

**{¶ 47}** In her first assignment of error, Mother argues that the juvenile court violated her right to due process by denying her motion to continue the permanent custody trial.

**{¶ 48}** Juv.R. 23 governs continuances in juvenile court. It states that "[c]ontinuances shall be granted only when imperative to secure fair treatment for the parties." Juv.Loc.R. 35 further provides:

> (A) Requests for continuances or advancements will be made in accordance with Superintendence Rule 41 and Juvenile Rules 19 and 23. All requests for continuances or advancements shall be filed with the Clerk of Court and submitted to the assigned jurist in writing at the earliest time possible, no less than seven (7) working days before the day of trial or hearing. The Court shall set a date certain for the next hearing date upon the granting of a continuance.

> (B) All requests for continuances shall contain the following information:

> (1) The date on which the need for the continuance arose;

> (2) The reasons for requesting the continuance;

> (3) The date on which all other attorneys of record and guardians ad litem on the case were contacted, and whether these

> attorneys and guardians ad litem agree on the need for a continuance; and,

> (4) The earliest date that all parties will be ready to proceed.

> (C) No case will be continued on the day of trial or hearing except for good cause shown, which cause was not known to the party or counsel prior to the date of trial or hearing, and provided that the party and/or counsel have used diligence to be ready for trial and have notified or made diligent efforts to notify the opposing party or counsel as soon as he/she became aware of the necessity to request a postponement. This rule may not be waived by consent of counsel.

**{¶ 49}** The grant or denial of a motion to continue is a matter that is generally "'entrusted to the broad, sound discretion of the trial judge.'" *In re Ka.C.*, 2015-Ohio-1158, ¶ 13 (8th Dist.), quoting *State v. Unger*, 67 Ohio St.2d 65, 67 (1981). A court abuses its discretion "when a legal rule entrusts a decision to a judge's discretion and the judge's exercise of that discretion is outside of the legally permissible range of choices." *State v. Hackett*, 2020-Ohio-6699, ¶ 19; *see also Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35 (describing the "common understanding of what constitutes an abuse of discretion" as "a court exercising its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority"). A court abuses its discretion when its decision is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983); *In re Ka.C.* at ¶ 13. A decision is unreasonable if no sound reasoning process would support the decision. *In re R.R.*, 2023-Ohio-2067, ¶ 92 (8th Dist.). A decision is arbitrary if it is made without consideration of or regard for the relevant facts or circumstances. *Id.*

**{¶ 50}** Where the granting of a continuance is necessary to allow a party a reasonable opportunity to prepare his or her case, the denial of a request for a continuance may violate a party's right to due process. *See, e.g., In re K.H.*, 2022-Ohio-2588, ¶ 67 (8th Dist.), citing *State v. Sowders*, 4 Ohio St.3d 143, 144 (1983). However, not every denial of a motion for continuance is a denial of due process. *In re K.H.* at ¶ 67, citing *In re C.W.*, 2020-Ohio-3189, ¶ 16 (8th Dist.).

**{¶ 51}** As the Ohio Supreme Court explained in *Unger*: "'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.'" *Unger* at 67, quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964); *see also In re I.N.*, 2021-Ohio-1406, ¶ 17 (8th Dist.); *In re A.W.*, 2020-Ohio-3373, ¶ 26 (8th Dist.). "Weighed against any potential prejudice to a [party] are concerns such as a court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice." *Unger* at 67.

**{¶ 52}** When evaluating a request for a continuance, a court should consider all relevant factors, including the following:

> the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case.

*Id.* at 67-68; *see also In re I.N.* at ¶ 17; *In re A.W.* at ¶ 27. However, a court is not required to give particular weight to any one of these factors. *In re K.H.* at ¶ 69. In permanent custody cases, courts must also "be mindful of the best interests of the children and their need for stability and permanency" in considering a request for a continuance. *In re I.N.* at ¶ 16.

{¶ 53} In her appellate brief, Mother contends that she requested a continuance because (1) her living situation had changed, (2) she was "receiving little communication from CCDCFS in recent months before the hearing" and (3) she had provided CCDCFS with "additional referrals not reviewed" and had "received little communications about whether they would be reviewed." She argues by the time of the permanent custody hearing, "months had passed since her last review" and that "a continuance for [a] more updated evaluation to be done" was "justified" by "the liberty interest of a parent to a child."

{¶ 54} Mother's oral motion for continuance at the permanent custody hearing, however, was not based on a change in her living situation or an alleged lack of communication with CCDCFS, as she now claims. The sole basis for continuance "'presented to the trial judge at the time the request [was] denied,'" *Unger*, 67 Ohio St.2d at 67, quoting *Ungar*, 376 U.S. at 589, was the fact that she had identified an additional, nonrelative potential placement for R.H. and the agency had not yet completed its evaluation of that individual.

{¶ 55} Mother has not shown that the juvenile court abused its discretion in denying her oral motion for continuance. Mother did not comply with Juv.Loc.R.

35 and did not show that a continuance was "imperative to secure fair treatment for the parties" as required under Juv.R. 23. Mother was provided notice of the hearing date nearly two months before, was aware long before the hearing date that the agency had not yet completed its investigation of D.N. as a possible placement for R.H. and did not file a written motion for continuance. No one filed a motion for legal custody and no one appeared at court to testify at the permanent custody hearing that they were willing and able to be a caregiver or legal custodian for R.H.

{¶ 56} In this case, Mother was not seeking to postpone the hearing due to the sudden, unexpected unavailability of parties, witnesses or other evidence or so that she or her counsel could better prepare for the hearing — the usual reasons eleventh hour requests for continuance are sought. As the juvenile court acknowledged, what Mother was really requesting with her motion for continuance was a further extension of temporary custody — the very issue to be decided at the permanent custody hearing. The juvenile court indicated that it would hear evidence on the status of the agency's investigation of D.N. as a possible placement for R.H. and would consider Mother's arguments on that issue when deciding the agency's motion to modify temporary custody to permanent custody. The record reflects that it did so. Mother has not cited any authority in which a juvenile court was found to have abused its discretion in denying a motion for continuance under similar circumstances.

**{¶ 57}** The juvenile court did not act unreasonably, arbitrarily or unconscionably in denying Mother's motion for continuance. Mother's first assignment of error is overruled.

### B. Permanent Custody Determination

**{¶ 58}** In her second assignment of error, Mother asserts that the juvenile court's judgment should be reversed because the agency did not provide clear and convincing evidence at the permanent custody hearing that it had made "reasonable efforts" to reunify R.H. and Mother in accordance with R.C. 2151.419(A).

### 1. Standard for Granting Permanent Custody to CCDCFS

**{¶ 59}** R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody. A juvenile court may grant a public child services agency's motion for permanent custody if it determines, by clear and convincing evidence, that (1) permanent custody is in the best interest of the child and (2) any of the following circumstances exists:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
>
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶ 60} When assessing whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents under R.C. 2151.414(B)(1)(a), a juvenile court must consider "all relevant evidence." R.C. 2151.414(E). If the court finds, by clear and convincing evidence, that at least one of the factors specified in R.C. 2151.414(E) exists as to each of the child's parents, the juvenile court must find that the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents. *Id.*

{¶ 61} With respect to a child's best interest, R.C. 2151.414(D)(1) states that in determining whether permanent custody is in a child's best interest, the court "shall consider all relevant factors," including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . ;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]

(e) Whether any of the factors in [R.C. 2151.414(E)(7) to (11)] apply in relation to the parents and child.

**{¶ 62}** The best interest determination focuses on the child, not the parent. *In re N.B.*, 2015-Ohio-314, at ¶ 59 (8th Dist.). Indeed, R.C. 2151.414(C) expressly prohibits the juvenile court from considering the effect the granting of permanent custody to the agency would have upon the parents. *In re J.C.-A.*, 2020-Ohio-5336, ¶ 80 (8th Dist.). Although the juvenile court is required to consider each relevant factor in determining what is in a child's best interest, no one factor is required to be given greater weight than the others. *In re A.L.*, 2024-Ohio-1992, ¶ 31 (8th Dist.), citing *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Further, only one of the factors need be resolved in favor of permanent custody to terminate parental rights. *In re R.M.*, 2024-Ohio-1885, ¶ 60 (8th Dist.); *In re J.C.-A.* at ¶ 80.

**{¶ 63}** "Clear and convincing evidence" is that "'measure or degree of proof'" that "'produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Z.C.*, 2023-Ohio-4703, ¶ 7, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. "It is intermediate, being more than a mere preponderance, but not to the extent of such

certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." (Emphasis deleted.) *Cross* at 477.

## 2. Standard of Review in Permanent Custody Cases

{¶ 64} In *In re Z.C.*, 2023-Ohio-4703, the Ohio Supreme Court clarified the standard of review in permanent custody cases, indicating that sufficiency of the evidence and/or manifest weight of the evidence — and not abuse of discretion — are the proper appellate standard(s) of review of permanent custody determinations depending on the arguments raised by the appellant. *Id.* at ¶ 11.

{¶ 65} "Sufficiency of the evidence and manifest weight of the evidence are distinct concepts and are "'both quantitatively and qualitatively different.'"" *Id.* at ¶ 13, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus. "'[S]ufficiency is a test of adequacy.'" *In re Z.C.* at ¶ 13, quoting *Thompkins* at 386. "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when the evidence is legally sufficient to support the [factfinder's determination] as a matter of law." (Cleaned up.) *In re Z.C.* at ¶ 13.

{¶ 66} Manifest weight of the evidence, on the other hand, "is not a question of mathematics, but depends on its effect in inducing belief." (Cleaned up.) *Id.* As the Court explained in *In re Z.C.*:

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and

a new trial ordered. [*Eastley*] at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*In re Z.C.* at ¶ 14.

### 3. The Juvenile Court's Decision to Grant Permanent Custody of R.H. to the Agency

{¶ 67} In this case, the juvenile court found by clear and convincing evidence that permanent custody was in R.H.'s best interest and that R.C. 2151.414(B)(1)(a) applied. With respect to its best-interest determination, the juvenile court identified the factors it considered in determining that permanent custody was in R.H.'s best interest as follows:

> In considering the best interests of the child, the Court considered the following relevant factors pursuant to 2151.414(D)(1): The interaction and interrelationship of the child with [her] parents, siblings, relatives, and foster parents; the wishes of the child; the custodial history of the child, including whether she has been in temporary custody of a public child services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period; her need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and whether any of the factors in [d]ivision (E)(7)-(11) of [section 2151.414] apply in relation to the parents and child.

The juvenile court further noted that the guardian ad litem had recommended permanent custody as being in the best interest of R.H.

{¶ 68} With respect to whether R.H. could not be placed with either of her parents within a reasonable time or should not be placed with her parents, the juvenile court found that the factors specified in R.C. 2151.414(E)(1), (2), (4) and (10) applied to Mother and Ras.H.:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties[;]
>
> (2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;
>
> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child; . . .
>
> (10) The alleged father has abandoned the child.

{¶ 69} The juvenile court explained its findings, as it relates to Mother, as follows:

Approximately ten different referrals were made for the mother for case plan services for substance abuse and mental health. However, the mother has not complied with these services, has continued to use substances, and has not remedied the conditions causing the removal of the child from her care and custody. In February 2023, the Magistrate ordered the mother into a residential treatment program. The mother did 30 days [in] such a program and was asked to leave by the treatment facility. The mother was requested to provide urine screens to measure or verify her sobriety. The last screen provided was on April 3, 2023, and it was positive. The mother's behavior at visits can be erratic because she has not addressed her mental health, and the child reacts to the mother's behavior at visits in a way that is concerning. The mother does not have stable housing for the child.

. . .

No one has filed a written Motion for Legal Custody of the child.

### 4. Determination that the Agency Had Made "Reasonable Efforts" to Reunify R.H. with Mother

**{¶ 70}** Mother does not specifically challenge the juvenile court's findings under R.C. 2151.414(B)(1)(a), R.C. 2151.414(E) or its determination that granting permanent custody of R.H to the agency was in the best interest of R.H. Mother argues only that the juvenile court's judgment should be reversed because its reasonable-efforts determination under R.C. 2151.419(A) in its permanent custody order was not supported by clear and convincing evidence. Mother argues that the agency failed to prove that it had "exhausted all options" with Mother because it "failed to continue to communicate and evaluate her situation up until the trial." She contends that the "primary focus at the legal custody [sic] hearing should have been on the current suitability of Mother rather than focusing solely on the historic facts that were initially established in the case" and that "the obligation for CCDCFS before moving for permanent custody is to be diligent and reasonable to the mother

of a child throughout the hearing to the end and not near to the end." She claims that Mother "attempted to provide CCDCFS with additional and updated information" but that the agency had "effectively closed the book on her" and was "unwilling to pursue her case any further."

**{¶ 71}** The agency responds that the juvenile court was not required to make a reasonable-efforts determination at the permanent custody hearing because (1) the juvenile court had previously made reasonable-efforts findings in its June 28, 2023, September 27, 2023 and November 27, 2023 orders, which were not challenged by Mother and (2) in any event, the juvenile court's reasonable-efforts determination in its order granting the agency's motion for permanent custody was supported by clear and convincing evidence. Following a thorough review of the record, we agree.

**{¶ 72}** R.C. 2151.419(A) states, in relevant part:

> Except as provided in [R.C. 2151.419(A)(2), at any hearing held pursuant to section 2151.28, division (E) of section 2151.31, or section 2151.314, 2151.33, or 2151.353 of the Revised Code at which the court removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency or private child placing agency that filed the complaint in the case, removed the child from home, has custody of the child, or will be given custody of the child has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home. The agency shall have the burden of proving that it has made those reasonable efforts. . . . In determining whether reasonable efforts were made, the child's health and safety shall be paramount.

**{¶ 73}** R.C. 2151.419(B)(1) further provides:

A court that is required to make a determination as described in [R.C. 2151.419(A)(1) or (2)] shall issue written findings of fact setting forth the reasons supporting its determination. If the court makes a written determination under division (A)(1) of this section, it shall briefly describe in the findings of fact the relevant services provided by the agency to the family of the child and why those services did not prevent the removal of the child from the child's home or enable the child to return safely home.

{¶ 74} The Ohio Supreme Court has held that "R.C. 2151.419(A)(1) does not

apply in a hearing on a motion for permanent custody filed pursuant to R.C.

2151.413." As the Court explained in *In re C.F.*:

> By its terms, R.C. 2151.419 applies only at hearings held pursuant to R.C. 2151.28, 2151.31(E), 2151.314, 2151.313 or 2151.353. *See* R.C. 2151.419(A)(1). These sections involve adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children, all of which occur prior to a decision transferring permanent custody to the state. The statute makes no reference to a hearing on a motion for permanent custody. Therefore, "[b]y its plain terms, the statute does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414." [*In re A.C.*, 12th Dist. Clermont No. CA2004-05-041, 2004-Ohio-5531], ¶ 30.

> This does not mean that the agency is relieved of the duty to make reasonable efforts. At various stages of the child-custody proceeding, the agency may be required under other statutes to prove that it has made reasonable efforts toward family reunification. To the extent that the trial court relies on R.C. 2151.414(E)(1) at a permanency hearing, the court must examine the "reasonable case planning and diligent efforts by the agency to assist the parents" when considering whether the child cannot or should not be placed with the parent within a reasonable time. However, the procedures in R.C. 2151.414 do not mandate that the court make a determination whether reasonable efforts have been made in every R.C. 2151.413 motion for permanent custody.

> Therefore, we hold that R.C. 2151.419(A)(1) does not apply in a hearing on a motion for permanent custody filed pursuant to R.C. 2151.413.

*Id.* at ¶ 41-43. As the Court further explained, however, "except for some narrowly defined statutory exceptions" — not applicable here — "the state must still make reasonable efforts to reunify the family during the child-custody proceedings prior to the termination of parental rights." *Id.* at ¶ 43. "If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.*; *see also In re B.B.C.*, 2024-Ohio-588, ¶ 34-39 (8th Dist.).

**{¶ 75}** In this case, as detailed above, on several occasions prior to the permanent custody hearing, the juvenile court determined that the agency had made reasonable efforts to prevent the removal of R.H. from her home, to eliminate the continued removal of R.H. from her home or to make it possible for R.H. to return home. The juvenile court set forth specific findings regarding the reasonable efforts made by the agency and the reasons those efforts were unsuccessful. *See* R.C. 2151.419(B)(1). Because the juvenile court made reasonable-efforts findings before placing R.H. in permanent custody of the agency, it was not required to do so again in its judgment entry granting the agency's motion for permanent custody. *See, e.g., In re B.B.C.* at ¶ 39.

**{¶ 76}** Nevertheless, regardless of whether it was required to do so, the juvenile court included a reasonable-efforts determination in its judgment entry granting permanent custody of R.H. to the agency. The juvenile court found that the agency had made reasonable efforts to prevent the removal of R.H. from her home and to finalize the permanency plan for R.H. The juvenile court also set forth

specific findings detailing the reasonable efforts made by the agency and the reasons why those efforts were unsuccessful. These findings are supported by clear and convincing evidence in the record.

{¶ 77} In general, "reasonable efforts" refers to "'[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed.'" *In re C.F.*, 2007-Ohio-1104, at ¶ 28, quoting Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation*, 12 B.U.Pub.Int.L.J. 259, 260 (2003). "'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.'" *In re H.M.K.*, 2013-Ohio-4317, ¶ 95 (3d Dist.), quoting *In re D.A.*, 2012-Ohio-1104, ¶ 30 (6th Dist.). In other words, the agency must use reasonable efforts to help remove the obstacles preventing family reunification. *In re L.H.*, 2024-Ohio-2271, ¶ 60 (8th Dist.), citing *In re C.B.C.*, 2016-Ohio-916, ¶ 76 (4th Dist.).

{¶ 78} In this case, Mother's mental health, substance abuse and lack of appropriate housing were the primary obstacles preventing Mother's reunification with R.H.. R.H. was removed from her mother's care and placed in predispositional temporary custody in November 2022. The record reflects that even before R.H. was removed from Mother's care, the agency worked with Mother in attempt to address her mental health, substance abuse and housing issues.

{¶ 79} Whitman and Pountney testified regarding the numerous attempts made by the agency, dating back to June 2022, to assist Mother in addressing her mental health, substance abuse and housing issues. As detailed above, Whitman testified that the agency made approximately ten different referrals for Mother for substance abuse and mental health services. Whitney and Pountney also testified regarding referrals made to assist Mother with securing appropriate housing. Mother, however, consistently failed to follow through with agency referrals, missing appointments, failing to comply with program requirements and ignoring recommendations for services. By the time of the permanent custody hearing, Mother had completed only a 30-day inpatient substance abuse program, did not follow through with recommended treatment and was not maintaining her sobriety. Likewise, despite numerous referrals, at the time of the permanent custody hearing, Mother was not engaging in mental health services or taking medication for her significant mental health issues and had not obtained safe, stable permanent housing.

{¶ 80} In her appellate brief, Mother admits that "[s]he has continually tested positive for marijuana, and she has been provided multiple opportunities by CCDCFS where her actions or behaviors foiled the situation." Mother further admits that "[f]rom the early stages of the case [Mother] had not been successful in many of the programs and situations that CCDCFS recommend she take." Nevertheless, Mother contends that "[b]y the time of the hearing, CCDCFS hadn't adequately evaluated [Mother] and therefore didn't know where she was in her progress." The

record does not support this claim. Contrary to Mother's assertion, the agency was not required to "exhaust[] all options" in attempting to reunify R.H. with Mother. "The issue in a reasonable-efforts determination is not whether the agency could have done more, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of the case." *In re A.F.*, 2021-Ohio-4519, ¶ 35 (8th Dist.). "'"Reasonable efforts" does not mean all available efforts.'" *In re J.B.*, 2020-Ohio-3675, ¶ 21 (8th Dist.), quoting *In re Lewis*, 2003-Ohio-5262, ¶ 16 (4th Dist.). "Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." *Lewis* at ¶ 16; *In re K.W.*, 2018-Ohio-3314, ¶ 45 (8th Dist.) ("Whether an agency . . . made reasonable efforts pursuant to R.C. 2151.419 is based on the circumstances of each case, not whether there was anything more the agency could have done."); *cf. In re J.B.* at ¶ 19-22 (8th Dist.) (rejecting mother's argument that it was CCDCFS' responsibility to make additional referrals, and that because it failed to do so, CCDCFS did not make reasonable efforts for reunification); *In re Nelson*, 2004-Ohio-268, ¶ 14 (2d Dist.) (rejecting argument that agency should have taken "a more proactive role" in monitoring mother's counseling progress and attendance and noting that "the [a]gency's purpose is to act as a guide" not "to force the mother to complete the case plan").

{¶ 81} Mother clearly cares for R.H. and it appears that R.H. cares for Mother. However, in determining what is in a child's best interest, the existence of a "positive relationship," a "good relationship" or a "bond" with a parent is not

controlling in and of itself. *In re J.B.*, 2013-Ohio-1704, at ¶ 111 (8th Dist.); *In re T.W.*, 2005-Ohio-6633, ¶ 15 (8th Dist.). "A child's best interests require permanency and a safe and secure environment." *In re E.W.*, 2014-Ohio-2534, ¶ 29 (8th Dist.). Although "[f]amily unity and blood relationship are vital factors to carefully and fully consider," the "paramount consideration" is always the best interest of the child. *In re J.B.* at ¶ 111. While Mother loves R.H. and has visited with her regularly, at the time of the permanent custody hearing, Mother continued to struggle with mental health and substance abuse issues, had not completed recommended treatment, was not actively engaged in services and was unable to provide stable, appropriate housing for her child. There is nothing in the record to indicate that Mother would be able to consistently meet her child's basic needs at any reasonable time in the future.

{¶ 82} The record further reflects that CCDCFS developed a reasonable case plan and worked with Mother for more one-and-one-half years, offering Mother numerous referrals and services in an attempt to reunite her with her daughter. Following a thorough review of the record, we cannot say that the agency failed to meet its obligations under R.C. 2151.419(A). The juvenile court's reasonable-efforts findings were supported by clear and convincing evidence and were not against the manifest weight of the evidence. Accordingly, Mother's second assignment of error is overruled.

{¶ 83} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the Cuyahoga County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

MARY J. BOYLE, J., and
ANITA LASTER MAYS, J., CONCUR